(C. D. 1709)

NAUMES FORWARDING SERVICE *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 16, 1955)

*Wallace & Schwartz* (*Barnes, Richardson & Colburn* by *Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Richard H. Welsh*, trial attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: The merchandise in this case consists of asparagus in tins, imported from France on or about September 17, 1951, and assessed with duty at 35 per centum ad valorem under paragraph 775 of the Tariff Act of 1930 as vegetables, prepared, not specially provided for. It is claimed that it is properly dutiable at 17½ per centum ad valorem under said paragraph, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52373, and the President's proclamation of May 13, 1950, T. D. 52476, as vegetables, packed in brine.

The pertinent provisions of paragraph 775, as originally enacted and as modified, are as follows:

PAR. 775 [as originally enacted]. Vegetables * * * prepared or preserved in any other way and not specially provided for; * * * 35 per centum ad valorem; * * *.

PAR. 775 [as modified]. Vegetables (including horseradish), if pickled, or packed in salt or brine and not specially provided for (except cucumbers and onions), 17½% ad val.

It was conceded at the trial that if the merchandise was found to be packed in brine, it was entitled to entry at the lower rate.

Plaintiff called Ralph S. Lowenstein, vice president of Reese Finer Foods, Inc., formerly Swiss American Food Co., who testified as follows: The business of the company is importing, packing, and distributing food specialties. The witness has been in that business for 10 years and has been buying merchandise in this country and abroad for about 5 years. He has bought and sold merchandise all over the United States and has personally traveled in all sections of the country. As a result of his experience in buying and selling various foodstuffs, he has become familiar with the terms "in brine" and "packed in brine." He has bought and sold merchandise, packed in brine, such as fancy vegetables, pickles, olives, and certain fish items. In his opinion, brine is a solution consisting of water, salt, and added acidity, and such a solution is generally known in the food industry as brine.

The witness stated that he was familiar with the merchandise involved herein; that he thought he had purchased it; and that it was sold through the firm's sales organization, of which he is manager. It was sold as asparagus in brine. Counsel agreed that the product was in a liquid solution, containing 0.44 per centum of salt by weight and 0.08 per centum of citric acid by weight. The witness stated that the product was packed in brine, as he understood the term. He added:

A. There only can be a question of various degrees of brine, strength of brine.

JUDGE MOLLISON: Do you know those various degrees or strengths of brine?

THE WITNESS: All I know is there are strong brines and weaker brines, but this solution in its consistency definitely is termed in the food industry as a brine.

On cross-examination, the witness testified that he had examined the merchandise by opening the cans, but he did not have the contents analyzed. He knew the product was in a liquid solution. He had never dealt in brine or made any. He did not know the chemical formula thereof but knew there were strong and weak brines. A weak brine, in his view, was one where the percentage of acid and salt was much lower than in a pickling brine.

XQ. So you know there are strong and weak, but you don't know where one begins and the other one lets off?—A. That is right.

XQ. You don't know how in the trade this would be recognized?—A. In the trade this is recognized as brine.

XQ. How do you know?—A. Because I bought the merchandise from the factory where it was packed.

XQ. You bought that and sold it as packed in brine, and you thought that is what it was?—A. That is right.

The Government called Foster K. Ballard, assistant chief chemist at the United States Customs Laboratory at Chicago. He testified that he had worked in the laboratory for 30 years and had been assistant chief chemist for the last 17 years. During that time, he had worked on chemical problems and made chemical analyses and reports on a great many products. He was a college graduate and had also been an examiner for about 13 years.

The witness stated that he did not analyze the asparagus herein personally but that it had been analyzed under his supervision. The liquid was analyzed for salt and for acidity, which was calculated as citric acid. The purpose of the analysis was to determine if the sample was pickled or in brine. In his opinion, it was not. He agreed with the definition of brine as "water saturated or strongly impregnated with common salt" (Webster's New International Dictionary, 1936 edition). He did not consider the solution herein saturated or strongly impregnated with salt because of the percentage of salt found by the analysis and because the salt was barely perceptible to the taste. He said that a saturated solution of salt and water would contain approximately 26 per centum of salt by weight, that being the maximum solubility of salt in water.

The witness did not think the salt in this solution preserved the asparagus. He said that the merchandise was contained in a hermetically sealed container and that it was preserved by being so sealed and sterilized, that is, by heat. He did not think the presence of the salt and the acidity played any part in the preservation of the merchandise.

On cross-examination, the witness stated he had tasted the solution because salt shows up readily in the taste. He could taste some salt, but it was very, very slight. His testimony was based upon his experience and opinion as a chemist and upon the dictionary definition of the term "brine." He had never bought or sold vegetables commercially. He said that a solution does not have to have 26 per centum of salt in order to be brine but that it must be strongly impregnated with salt.

The question before us is whether this product, which was in a saline solution containing 0.44 per centum of salt by weight, was packed in brine within the meaning of that term as used in the tariff act. This issue has been before the courts on many occasions, and a review of the cases shows that the conclusions reached depended not only upon the percentage of salt in the solution but upon its preservative effect.

One of the leading cases on this subject is *Mihalovitch, Fletcher & Co.* v. *United States*, 4 Ct. Cust. Appls. 98, T. D. 33372, which involved cherries that had been subjected to sulfur fumes and placed in a saline solution containing from one-half of 1 per centum to a little over 2 per centum of salt. In the course of its opinion, the court pointed out that the purpose of paragraph 559 of the Tariff Act of 1897, which granted free entry to fruits in brine, was to enable importers to bring in certain fruits preserved by means of a saline solution, and that any quantity of salt in water which would attain that end could be termed "brine" within the intent of the law. The court found that the merchandise before it was not in brine, since the evidence did not establish that there was sufficient salt in the solution to preserve the cherries.

In *Delapenha & Co.* v. *United States*, 6 Ct. Cust. Appls. 18, T. D. 35252, the court pointed out (p. 19):

It may be noted that the standard dictionaries uniformly define "brine" to be "water saturated or strongly impregnated with salt." Therefore, according to common usage, the term can hardly be applied to water which contains only seven one-hundredths of 1 per cent of salt, for such a percentage would certainly not saturate or strongly impregnate the water in which it was dissolved.

The court also noted that, while the trade applied the name "cherries in brine" to such cherries as were imported in any saline solution sufficiently strong to preserve them during transportation, the cherries in question had been preserved by a sulfur treatment and the infusion of salt in the water was negligible.

This decision was approved in *Moscahlades Bros.* v. *United States*, 13 Ct. Cust. Appls. 633, T. D. 41482, which involved olives in 50-gallon barrels, containing a quarter gallon to 2 gallons of salty fluid, and in *Lekas & Drivas* v. *United States*, 19 C. C. P. A. (Customs) 389, T. D. 45523, which involved beans in the pod, immersed in a

saline solution containing 0.78 per centum of salt. Neither of the said products was found to be in brine.

A review of the cases on this subject is contained in a more recent decision of this court, *Moscahlades Bros., Inc.* v. *United States*, 8 Cust. Ct. 389, C. D. 644, wherein it was held that beans in a saline solution, containing 1.3 per centum of salt, were not in brine. The court said (p. 395):

> A careful examination of the evidence in the case at bar discloses that the liquid contained in the cans is salty to the taste. The testimony of the Government chemist is inconclusive as to the percentage of salt contained in the liquid. We are not enlightened concerning whether or not the presence of the salt in the liquid contents of the can acted as the sole preservative of the beans. Presumably the sterilization thereof in hermetically sealed cans would have preserved the beans without the addition of salt to the water. Neither is there anything in the evidence tending to establish that the beans in question are bought and sold in the wholesale trade and commerce of the United States as beans in brine. In view of the judicial interpretation of the words "in brine" as announced in the foregoing decisions, we are of the opinion that the beans in question are of the same dutiable character as the beans the subject of decision in the *Lekas & Drivas* case, *supra*, wherein they were held to be "prepared or preserved."

We conclude that, in the absence of proof of commercial designation, the term "brine," as used in tariff statutes in connection with fruits or vegetables, means a saline solution which is saturated with or strongly impregnated with salt, or one which is shown by positive evidence to contain sufficient salt to act as a preservative.

The cases cited by the plaintiff are in accord with this view. For instance, in *R. Gomez & Dietlin Co.* v. *United States*, 37 Treas. Dec. 19, T. D. 38090, it was held that cherries in a saline solution, containing from 0.588 to 0.595 per centum of salt, were free of duty as fruits in brine, on the ground that the salt was sufficient to preserve the fruit, and on the further ground that, by commercial designation, the merchandise was classifiable as fruits in brine. On the other hand, in *A. J. Coccaro* v. *United States*, 30 Treas. Dec. 840, Abstract 39799, it was held that cherries in solutions, containing 0.557 and 0.422 per centum of salt, respectively, were not fruits in brine, since they had been preserved by sulfur treatment rather than by salt.

The solution in the instant case contained but 0.44 per centum of salt by weight. Therefore, it is not brine within the dictionary definition of that term, since it is not a solution saturated with or strongly impregnated with salt. It is not saturated, as a saturated solution would contain 26 per centum of salt. It is not strongly impregnated with salt, as it contains but a small percentage thereof, only slightly perceptible to the taste.

Nor does it appear that this solution acted as a preservative. Plaintiff's witness did not testify on this point, stating only that he bought and sold the product as packed in brine and, therefore, thought

that it was in brine. In the view of defendant's witness, on the other hand, the salt did not act as a preservative, but the merchandise was preserved by being hermetically sealed in cans and sterilized.

Although plaintiff relies upon testimony that this merchandise was bought and sold as packed in brine and that a solution such as that herein is considered brine in the food industry, the evidence was not sufficient to establish a commercial meaning differing from the common meaning of the terms "brine" or "packed in brine" under the commercial designation rule.

For the reasons stated, we hold that the merchandise herein was not packed in brine. Therefore, it is properly dutiable at 35 per centum ad valorem under paragraph 775 of the Tariff Act of 1930, as vegetables, prepared, rather than under said paragraph, as modified, as vegetables in brine. The protest is overruled and judgment will be rendered for the defendant.